UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) CAUSE NUMBER 3:07-CR-77(01)RM |
| | ) |
| TERRY E. MACLIN | ) |

OPINION AND ORDER

This cause came before the court on January 28 for hearing on defendant Terry Maclin's motion to suppress evidence. For the reasons that follow, the court denies Mr. Maclin's motion to suppress because the officer's initial detention of Mr. Maclin was supported by reasonable suspicion of criminal activity.

In the early morning hours of December 9, 2006, Elkhart Police Corporal Karl Miller responded to a call concerning a person breaking into cars at the Williamsburg Apartment complex. The evening was cold enough that snow was on the ground, but it wasn't snowing. In his marked police car and the area of the initial theft report, Corporal Miller saw a person who later turned out to be Terry Maclin walking westbound, toward the police car. Mr. Maclin appeared to look in the officer's direction, then turned north, a route that placed an apartment building between Corporal Miller and Mr. Maclin. Corporal Miller saw no one else outside on foot.

Corporal Miller, parked directly south of that apartment building, knew that a retention pond eventually blocked a pedestrian's progress in the direction Mr. Maclin was walking. Corporal Miller drove to the parking lot west of the building,

and began walking around the north side of the building. Given the time (shortly after midnight), weather (cold), and that Mr. Maclin was on foot, Corporal Miller was suspicious of what Mr. Maclin was up to. As Corporal Miller came around the north side of the building, he saw Mr. Maclin walking toward him, in a northwesterly direction. Photographs of the area show no entrances to apartments on the north side of the building. Mr. Maclin appeared (to Corporal Miller) to see the officer, and turned back the other way. Corporal Miller ordered Mr. Maclin to stop, and Mr. Maclin kept walking. Corporal Miller again ordered him to stop and come toward Corporal Miller, and Mr. Maclin kept walking.

On the third such command, Mr. Maclin turned his head in Corporal Miller's direction and appeared to say something. Corporal Miller yelled to him again and started to pick up his pace. Mr. Maclin stopped and started to turn towards Corporal Miller. As Mr. Maclin turned, Corporal Miller saw something fall from Mr. Maclin's right hand. Mr. Maclin and Corporal Miller walked toward each other. When they were face to face, Corporal Miller smelled a strong odor of alcoholic beverages on Mr. Maclin's breath. When another officer arrived on the scene, Corporal Miller went to the spot where he saw Mr. Maclin drop something, and found a firearm. No tracks were in the snow around the firearm other than Corporal Miller's and Mr. Maclin's.

Mr. Maclin told the officers he was looking for a friend's house, but was unable to tell the officers the friend's name or where the friend lived. The officers arrested Mr. Maclin for public intoxication, and Mr. Maclin's blood alcohol content

registered a .20% (two and a half times the legal limit for drivers) on a portable breath test device.

Mr. Maclin remembers things differently, though he concedes he was intoxicated. As Mr. Maclin recalls it, a friend, Herbert Roberts, had driven the two of them to the apartment complex in search of a friend's residence. Mr. Maclin remained in the car while Mr. Roberts went off to find the friend's apartment. About fifteen minutes later, Mr. Roberts called Mr. Maclin on Mr. Maclin's cell phone to direct him to the apartment. Mr. Maclin says he was walking through the complex on the cell phone and didn't know any police officer was nearby until he noticed the officer's flashlight. Mr. Maclin says he complied with the first order that he heard. He denies having had, or having dropped, a firearm.

Now charged with possessing a firearm after conviction of a felony, Mr. Maclin moves to suppress the firearm from evidence.

It seems unnecessary for the court to choose whether to credit Mr. Maclin's testimony or Corporal Miller's testimony, because Mr. Maclin's testimony explains, rather than contradicts, Corporal Miller's. A police officer who knows he is watching a man drunkenly wander around an apartment complex as a friend tried to guide him telephonically to a destination would, no doubt, be less suspicious that criminal activity is afoot. But even if Mr. Maclin's testimony is taken at face value, Corporal Miller didn't know that was what he was watching. His perception was much different. That there may have been additional facts unknown to a police officer doesn't affect the reasonableness of the officer's suspicion, so long

3

as the suspicion arises from facts the officer reasonably believes to be true. *See generally* United States v. Amaral-Estrada, 509 F.3d 820, 827 (7th Cir. 2007).

To the extent credibility determinations might be deemed important to resolution of the suppression motion, though, the court credits Corporal Miller's testimony. First, Corporal Miller didn't have a blood alcohol content of .20. Second, Corporal Miller was investigating a crime shortly after midnight, without any other officers providing assistance or backup; his powers of observation had to be especially keen.

Mr. Maclin contends that when he finally complied with Corporal Miller's repeated demands to stop and talk, he was seized within the meaning of the Fourth Amendment without reasonable suspicion that he had engaged in criminal activity. He argues that his mere presence near a location of an unreliable report of crime was insufficient to justify Corporal Miller's investigatory stop of Mr. Maclin.

An officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. . . . [T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *See,* Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (*quoting* Terry v. Ohio, 392 U.S. 1, 27 (1968)).

Reasonable suspicion to make an investigatory stop is a less demanding

4

standard than probable cause. United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006). Reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, and can arise from information that is less reliable than that required to show probable cause. Alabama v. White, 496 U.S. 325, 330 (1990). Reasonable suspicion depends upon both the content of information possessed by police and its degree of reliability. Id. Both factors, quantity and quality, are considered when looking at the totality of the circumstances. Id. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the required quantum of suspicion than would be required if the tip were more reliable. Id.

Corporal Miller had objectively reasonable grounds to suspect Mr. Maclin of criminal activity. Complaints were made that a person was breaking into cars at the Williamsburg Apartment Complex parking lot. This may not have been the most reliable of tips, but when Corporal Miller arrived, Mr. Maclin was the only person in the area of the initial theft report. As Corporal Miller saw it, Mr. Maclin noticed the officer and changed direction, placing an apartment building between the two. Corporal Miller then saw Mr. Maclin walking in an area that provides no ingress to any apartment, doing so in the middle of winter and in the middle of night, and again changing direction upon appearing to notice the officer. Finally, Mr. Maclin failed to stop when Corporal Miller, in uniform, directed him to do so. *See* United States v. Quinn, 83 F.3d 917, 921-922 (7th Cir. 1996) (citing United States v. Weaver, 8 F.3d 1240, 1244 (7th Cir. 1993). Corporal Miller had

5

reasonable, articulable suspicion to briefly detain and question Mr. Maclin as to his identification and the reason for his presence in the apartment complex. Corporal Miller detained Mr. Maclin, as Terry v. Ohio, 392 U.S. 1, permits, United States v. Shoals, 478 F.3d 850, 853 (7th Cir. 2007) ("It is pointless, of course, for Shoals to focus here on his acquiescence to the officers' command that he exit the house; that just means that he was *seized*—an intrusion that is necessarily present in every Terry stop. . . . What really matters is the manner in which Shoals was seized and what happened afterward.") (emphasis in original), and Corporal Miller never exceeded the permissible scope or duration of the detention.

Because the initial seizure was legal, the court DENIES the motion of defendant Maclin (Doc. No. 23) to suppress the evidence obtained as a result of the lawful encounter.

SO ORDERED.

ENTERED:  January 28, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court